**Herbert S. LATIMER, Plaintiff-Appellee,**

**v.**

**GENERAL MOTORS CORPORATION, Defendant-Appellant.**

**No. 75–1769.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 1976.

Decided June 2, 1976.

Rehearing and Rehearing En Banc Denied Sept. 3, 1976.

Henry J. Price, Indianapolis, Ind., Frazer F. Hilder, Detroit, Mich., for defendant-appellant.

W. Scott Montross, Indianapolis, Ind., for plaintiff-appellee.

Before SWYGERT and SPRECHER, Circuit Judges, and HOFFMAN, Senior District Judge.[1]

SWYGERT, Circuit Judge.

This appeal raises the question of whether a manufacturer has a duty to incorporate

1. The Honorable Julius J. Hoffman, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

safety devices in a product, designed and manufactured free from defects, in anticipation that the purchaser may misuse the product.

Appellee Herbert Latimer brought this diversity action against Appellant General Motors Corporation seeking damages for personal injuries received in a truck accident. Latimer was the driver of the truck, General Motors, its manufacturer. A jury returned a $75,000 verdict for Latimer. The trial judge denied General Motor's motions for directed verdict and judgment N.O.V. This appeal followed.

Latimer was an over-the-road truck driver for McLean Trucking Company. About 2:00 A. M. on February 23, 1972 he left the McLean depot in Indianapolis bound for Kansas City. He drove a 12,000 pound cab-over engine diesel single axle tractor, pulling a trailer loaded with 24,000 pounds of freight. The tractor had been built in 1965 by General Motors in conformity with special design specifications furnished by McLean.

Latimer was driving his tractor-trailer west on Interstate 70. It was 5:30 A. M., the temperature had dropped to 28 degrees, and a severe north wind was hitting the right side of the tractor-trailer. The highway was wet. The truck descended a slight incline and approached a bridge near the Illinois state line. Ice had formed on the left lane of the bridge and as Latimer drove onto the bridge, the truck drifted into the south lane and struck the bridge structure. It then veered to the north, struck the guardrail, and overturned as it catapulted down an embankment. Latimer suffered injuries for which he sought damages in this action.

In his report of the accident to his employer, the McLean Trucking Company, Latimer related that as he went onto the bridge the tractor was caught by a cross wind and was "carried across left lane into bridge, hit bridge three times on left side . . . came out of bridge, slid across pavement to right, unit came to rest broadway on the right side." Latimer testified at trial that there were no defects in the vehicle, and that he made no mention of any mechanical failures in any of his reports.

The plaintiff's entire case was built around the testimony of Robert Staley, an operator of a wrecker and mechanic business, who had service contracts with numerous trucking companies around Casey, Illinois, his business location. Staley testified both as an on-the-scene witness and as an expert. Called to the scene of the accident shortly after it happened, he inspected the overturned truck, saw the brake air lines were broken and the drive shaft was separated from the differential. He deduced that the pinion nut had come off the rearward connection of the drive shaft at the differential. It was his opinion that the drive shaft had struck the air lines, breaking them because they had been dangerously located at a point where they could be cut by the drive shaft if separated, which resulted in the brakes in the unit locking. After observing the broken air lines and separated drive shaft, Staley said he knew that the pinion nut was not far away, went back up the road, and found it. Staley said he had seen pinion nuts come off before and it was his opinion that a "U-clamp" could have been put around the drive shaft to restrict its motion if it would become separated, thus preventing it from striking the air lines.[2]

2. The following diagram illustrates the parts of the tractor which are critical to the plaintiff's theory as to the cause of the accident.

Transmission   SINGLE SHAFT TYPE   Axle

1 Universal Joint
2 Slip Yoke
3 Shaft
4 Pinion Yoke

It was undisputed that during the seven years driving of the tractor for over 650,000 miles, it was McLean's duty to service and maintain the unit. The pinion nut which allegedly came off the pinion shaft (thereby allowing the accident to occur under plaintiff's theory) was removed at least on two occasions by McLean employees when the differential was removed from the tractor. The pinion yoke was also replaced and the differential yoke seal was replaced. In April 1969 a new pinion nut was placed on the pinion shaft when a rebuilt differential was installed by McLean. New universal joints were installed in May and November of 1969.

Dr. Packer, an accident reconstruction expert, testified for General Motors that it was his opinion that the drive shaft was separated from the differential when the vehicle catapulted over the guardrail. It was also his opinion that the accident was caused by a combination of operator errors and bad weather.

Dr. Manos testified in rebuttal as an expert for the plaintiff that, in the absence of the cotter pin, the pinion nut would vibrate off and the drive shaft "walk" off the pinion nut, popping the grease cap under pressure, separating and striking the air lines, causing the brakes on the tractor to lock.[3]

I

The plaintiff based his claim for damages on three theories: strict liability, negligence, and implied warranty. He alleged that, as a result of defective manufacture and design of a cab-over engine tractor, a "nut came off a yoke on the tractor-trailer causing damage to the truck which in turn

---

The primary portion of the drive shaft (3) extends between two universal joints. At the rear, the drive shaft is attached via a universal joint (1) to the pinion yoke (4). The pinion yoke is then attached to the differential by a splined pinion shaft assembled in a "press" or very tight fit. The end of the pinion shaft is threaded and secured to the pinion yoke by the pinion nut. The pinion nut installed pursuant to specifications was a "castelled" nut through which a cotter pin was inserted as a safety device to keep the nut from falling off. The pinion shaft was designed with fine threads and the pinion nut on installation was tightened to 500 pound feet. Because of the fine threads, if the nut were properly tightened, it was Dr. Kenneth Packer's testimony that the cotter pin was redundant since the nut would not come off the pinion shaft during operation of the tractor. Plaintiff's expert witness, Dr. Thomas Manos, testified this pinion nut, in the absence of the cotter pin, was free to vibrate off.

At the front end, the drive shaft was connected to the transmission by a slip yoke (2). This yoke is hollow and allows some fore and aft movement of the drive shaft. As designed and installed there was a welded grease cap at the front of the slip area. Dr. Manos testified that the cap could pop off under pressure, a cap secured by two little welds.

**3.** There was a dispute in the evidence with respect to both where the pinion nut was found and whether, in fact, the brakes locked. Sherrill Staney, a McLean safety man who investigated the accident at its site, disputed Staley's testimony that he and Staley walked up the road together and found the nut. Staney also testified that when he visited the plaintiff at the hospital, Latimer told him that there had been no brake problem and that he "was thrown back and forth in the cab and could not hit the brake and could not apply the brakes."

Staley at first testified that only the left brake line was severed. After the plaintiff rested its case, the defendant introduced a videotape of an experiment made with a 1965 tractor similar to the one involved in the accident. The videotape conclusively demonstrated that severing the left air line would not cause the brakes to lock. After the defendant requested and was granted a continuance during the trial to perform his own tests on the tractor, Staley was recalled to the stand and testified that the right line was broken, contradicting his earlier testimony. Despite these disputed inconsistencies, we must view the evidence in the light most favorable to the plaintiff; we must assume that the jury resolved the conflicts in the evidence and were convinced that the plaintiff's theory was plausible.

caused the truck to lose air pressure in its brake system and all brakes locked up." At trial the plaintiff asserted that General Motors' failure to incorporate certain safeguards in the tractor was the proximate cause of the accident. Specifically, he maintained that General Motors failed either to install a safety collar around the drive shaft of the tractor or to locate the brake lines out of the proximity of the drive shaft in the event the shaft broke free.[4]

It is clear from the record that the insertion of a cotter pin was included in the design of the pinion nut and yoke structure as an added safety device to prevent the separation of the drive shaft from the differential. The record also demonstrates that no evidence was offered to prove that the cotter pin was absent when the tractor was delivered to the purchaser. Moreover, it is undisputed that McLean had removed and reinstalled the pinion nut during servicing of the tractor on two occasions between 1965 and the date of the accident. The owner had also replaced the pinion yoke and seal and replaced it with a new pinion nut on the pinion shaft. Under these circumstances the only possible inference which can be drawn is that, if the cotter key was missing at the time of the accident, it was the result either of fortuitous circumstances occurring after delivery of the tractor or of faulty maintenance by the owner of the vehicle.

■ Under the decisional law of Indiana the plaintiff has the burden of proving a defect in the product which existed at the time of delivery. *Downey v. Moore's Time-Saving Equipment, Inc.*, 432 F.2d 1088 (7th Cir. 1970). Whether a claim of liability against a manufacturer because of his prod-

uct is based on strict liability, implied warranty, or negligence, the manufacturer is liable only when the product is so defective as to render it "unreasonably dangerous." The manufacturer is not liable if the product becomes dangerous because of "misuse" of the purchase by a consumer. *Cornette v. Searjeant Metal Products, Inc.*, 147 Ind. App. 46, 258 N.E.2d 652 (1970). In that case, the plaintiff was injured while operating a machine manufactured by the defendant. The catalogue accompanying the machine described it as having an air filter. At the time of the accident there was no air filter on the machine. The absence of the filter caused it to malfunction resulting in the plaintiff's injuries. The Appellate Court of Indiana held that since there was no evidence an air filter was not on the machine at the time it was delivered, the proximate cause of the malfunction was the substantial change made by the removal of the filter and that the manufacturer was not responsible for the subsequent change.

■ Our discussion of the facts and the applicable law leads to the core of Latimer's case. He makes no contention that the cotter key was missing at the time of the tractor's delivery which would have rendered it defective. Indeed he could not successfully have made that contention. Rather plaintiff contends that General Motors breached its design duty in that it failed to safeguard against what might occur if the drive shaft separated from the differential. Although he concedes that General Motors designed effective safeguards (torque and cotter pin) to protect the drive shaft from separating, he focuses on the location of the brake lines. His brief is explicit and to the point:

4. The crux of plaintiff's case is contained in the following statement in his brief:

The rearward connection of the drive shaft was made through the use of a pinion nut which was secured by a cotter pin or key. Plaintiff admits and has always admitted that, if the cotter pin had been in place, there is no way the accident could have happened. Plaintiff has, however, also always contended that the absence of the cotter pin/key was a

reasonably foreseeable result of the intended use of the vehicle, namely over-the-road travel, and more specifically, the maintenance necessarily associated with such use. The evidence most favorable to plaintiff established that it was the absence of the cotter pin/key *only* that permitted the drive shaft to separate and in the absence of a drive shaft restraining device, strike the unreasonably dangerously placed air lines.

The gravamen of plaintiff's complaint was that the brake air lines were placed in such proximity to the drive shaft of the vehicle that when the drive shaft separated at its rearward connection, the lines were ruptured, the brakes on the unit immediately locked up, resulting in a loss of control of the vehicle, and it crashed. Given the dangerous location of those lines, defendant failed to provide a collar or other such channelling device which would prevent the drive shaft, once separated, from reaching the lines.

In essence, the plaintiff attempts to graft onto his theory of strict liability an element of foreseeability. Latimer asserts that a manufacturer should anticipate a "misuse" of the product and design safeguards against that contingency. Such is not the law.

*Schemel v. General Motors*, 384 F.2d 802 (7th Cir. 1967), stands for the proposition that a manufacturer is under no obligation to foresee and to guard against a danger that results from a misuse of the product. In that case, although agreeing that it was foreseeable that when the defendant built an automobile capable of going 115 miles per hour someone might drive the car at an excessive speed resulting in an accident, the court rejected the contention that the manufacturer had a duty to design against such misuse. We said:

> [T]he plaintiff . . . sought to impose on the automobile manufacturer a duty to design an automobile incapable of causing injury (or capable of minimizing injury) through foreseeable misuse for a purpose for which the automobile was never supplied. 384 F.2d at 805.

The Supreme Court of Indiana in *J. I. Case Co. v. Sandefur*, 245 Ind. 213, 197 N.E.2d 519 (1960), spoke directly to the issue before us:

> [T]here must be reasonable freedom and protection for the manufacturer. He is not an insurer against accident and is not obligated to produce only accident-proof machines. The emphasis is on the duty to avoid hidden defects or concealed dangers.

The motion for judgment notwithstanding the verdict should have been granted. The judgment is reversed.